Winchester, J., dissenting:
¶1 I dissent. I would allow the people to exercise their constitutional right of referendum. The proponents of this referendum are proposing that the people of the State of Oklahoma be allowed to decide whether to approve or disapprove legislation passed within the last 90 days by the State Legislature. The majority of signatures will likely come from those opposing the legislation. Nevertheless, the signatures may merely say, "Let's vote on it." Tax increases are important to the citizens of this state as evidenced by the vote of the people who enacted Article 5, § 33 of Oklahoma's Constitution,[1] which requires a three-fourths majority vote of both the House and the Senate to enact a revenue bill. The increase in taxes in certain areas is what this referendum addresses. While this Court's duty is to guard against fraud, corruption or deception in the referendum process, our decisions should not serve as a road block for the people to voice their objection to legislation. I agree with the majority opinion that this Court has a duty to preserve and protect "the sacred right of referendum," which is the right of the citizens of this state to challenge legislation.
¶2 The oral argument made clear that both sides to this controversy agree that our teachers need a raise. The challenge goes to whether or not this tax increase is to be used for those raises. There is no question the "exact text" or words from the bill are attached to the gist. However, the Court declares the petition invalid due to technicalities of not including "pagination," which is merely page numbers; paragraph numbers; writing the gist in a manner that may be confusing regarding a yes or no vote; and finally, not clarifying to the Court's satisfaction the small cigar tax and the fact that the hotel tax has subsequently been removed. I *883 am not persuaded that any of these minor blemishes in the petition would deceive voters when the issue comes up for a vote. The gist and bill together more than adequately inform a signer of the petition.
¶3 Collecting signatures for a referendum petition should not be a difficult task. The number of signatures necessary is five percent of those who voted in the last election for this state's governor. The referendum is merely asking for a vote on previously approved legislation.
¶4 If successful in collecting the necessary signatures, then the process of drafting a ballot title occurs. 34 O.S.Supp.2017, § 10.[2] Address concerns at that point and the Court can ultimately approve or disapprove the title that goes to a vote. If the proponents fail to collect the signatures, that ends the issue.
¶5 I would allow them to circulate their petition.
Wyrick, J., with whom Winchester, J., joins, dissenting:
¶1 At worst, this is a close case. Both the Secretary of State and the Attorney General-two perfectly reasonable people with frontline responsibility to gauge the sufficiency of referendum petitions[1] -have examined this petition and concluded that it is sufficient and can go to the people.[2] If reasonable people can disagree as to the sufficiency of a petition, then the petition isn't clearly deficient; and if it isn't clearly deficient, we should err on the side of letting the people have their say-even if we might quibble with some of the drafting choices made by the proponents.
¶2 Unfortunately, the Court chooses to quibble. In lawyering this petition to death, the Court finds it deficient because (1) it contains a gist that the Court deems insufficient for reasons that have no connection to the actual purposes of a gist nor to the text of any statute or constitutional provision, and (2) the copy of the measure the proponents attached omits 21 characters of text out of approximately 80,000-the entirely non-substantive, never-to-be-codified section numbers , at that. In doing so, the Court unnecessarily departs from our referendum petition precedents. I respectfully dissent.
I.
A.
¶3 Even assuming that we exercise valid authority when we put a gist under the judicial microscope,[3] the Court imposes a standard that will (1) require a gist that hopelessly confuses the average citizen as to what he is being asked to sign, and (2) effectively insulate revenue measures from the referendum process, in plain contravention of the Constitution's requirement that revenue *884 measures always be subject to the will of the people.
¶4 This is so because the majority insists that the gist of this referendum be phrased in a way that matches the ballot question. In so doing, the Court ignores the fact that a gist and ballot question help a citizen answer two different questions, at two distinct points in time: (1) do I want this measure to be put to a vote of the people? and (2) do I want this measure to become law? Unlike an initiative petition, where the answer to each question will be the same--i.e., a voter who wants the initiative to be on the ballot will also be in favor of approving the initiative--in the referendum context, a voter who wants the question on the ballot will be a voter who does not want the measure to become law. A referendum like this one, after all, is an attempt to undo the effect of a legislative enactment. Thus, a requirement that the gist of a referendum be phrased the same as the eventual ballot question will mislead voters into signing a petition when it is against their interest to do so, and vice versa.
¶5 Take the gist mandated by today's decision. According to the Court, it must tell a potential signer of the petition that he is being asked to sign a petition proposing a measure to approve a variety of new taxes.[4] The working Oklahoman who has a clipboard shoved in his face on the way out of the grocery store will read the Court's proposed gist and think that--if he is in favor of these new taxes--he should sign this petition. But that voter would be 100% wrong. The taxes have already been enacted. The purpose of the referendum is to undo that status quo. Those in favor of the new taxes do not want the referendum on the ballot . They want to maintain the status quo, and thus it is in their interest not to sign .
¶6 The opposite is also true. A voter opposed to the new taxes will read the Court's proposed gist and think that he should not sign the petition because he does not want to approve any new taxes. This is particularly problematic because this effectively undermines the Constitution's clear mandate that revenue bills be subject to referendum.[5] I cannot fathom how proponents of a referendum to disapprove new taxes will ever be able to collect the thousands of signatures they need when they are forced to collect those signatures with a petition that tells potential signatories that the proposal is to "approve" those new taxes, rather than to tell them more accurately that the proposal is to repeal those new taxes by popular vote.
¶7 The proponents' gist describes their measure as one proposing to repeal HB 1010xx's new taxes, which is the only accurate way to describe what they propose to do:
The Proposition is to repeal House Bill 1010XX which raised the gasoline taxes from 16 cents to 19 cents per gallon; raised the diesel fuel tax from 13 cents to 19 cents per gallon; raised the cigarette tax rate fifty (50) mills per cigarette; and raised the tax on the gross production of oil, gas, or oil and gas in the first 36 months of a well's production from 2% to 5%. This measure would restore those taxes to their original rates before House Bill 1010XX increased them when it was passed.[6]
Indeed, it is how anyone -save the members of the majority-would summarize this proposal.[7] That the Court nonetheless manages *885 to deem this gist as misleading illustrates its fundamental misapprehension of the meaning and purpose of a "simple statement of the gist of the proposition" in the referendum petition context.[8]
¶8 The Court's misunderstanding of the role of a gist in a referendum, and subsequent insistence that a referendum's gist be phrased in a way that does not accurately describe what its proponents seek to accomplish, will do serious, long-lasting harm to the people's ability to exercise their referendum power--particularly with respect to revenue measures. This is not what the people intended when they reserved to themselves the referendum power, and it is not what the people intended when they mandated that revenue measures be subject to that referendum power.
B.
¶9 The majority also faults the gist for failing to mention the referendum's effect on the already-repealed hotel/motel occupancy tax. Despite the majority's refusal to say so,[9] the referendum won't affect that already-repealed portion of HB 1010xx,[10] so the proponents' decision not to mention that portion of the bill in the gist is not only reasonable, but also correct. Moreover, because the majority itself refuses to say what effect the referendum will have on that tax, I am baffled as to how we can insist that the proponents do what the Court will not.[11]
C.
¶10 The majority next faults the gist for noting that HB 1010xx "raised the cigarette tax rate fifty (50) mills per cigarette,"[12] without specifying that the tax on "little cigars" was raised to the same rate.[13] The proponents correctly point out that little cigars make up only a sliver of the cigarette market, so the change of the rate on little cigars creates only a tiny fraction of the revenue generated by HB 1010xx--about *886 0.2% to be precise[14] --and thus it is precisely the sort of minor provision that needn't be in the gist. A gist of something, after all, is only its "main point" or the "pith of the matter,"[15] and the minuscule little cigar tax is hardly the "main point" of HB1010xx.[16]
¶11 But even accepting the majority's premise as true, that the little cigar tax is at the heart of this referendum such that a voter needs to know about this tax when being asked to sign this referendum petition, the referendum petition does put the voter on notice of this tax. As required by law,[17] the referendum petition contains a complete version of HB 1010xx's title, which includes a statement that "little cigars be taxed in the same rate and manner as cigarettes."[18] And if a potential signer of the petition wants even more detail than that, he or she can flip to the attached copy of HB 1010xx with the full provisions relating to little cigars.[19]
¶12 To say, as the majority does, that because something is in the measure, it must also be in the gist--or worse yet, because something is in the title of the measure, it must also be in the gist--is to render the gist requirement meaningless.[20] If everything that was in the title had to be in the gist, what's the point of requiring inclusion of the title? And the full text of the measure? A "simple statement of the gist" must, as a matter of logic and grammar, include less than what is in the title and text of the measure. This is inherent not only in the plain meaning of the term "gist," but also in the related provisions of law requiring inclusion of the title of the measure and its full text.
II
¶13 The Court also invalidates this referendum because the petition includes a copy of HB 1010xx that omits 21 of the bill's approximately 80,000 characters of text. Given *887 that this omission prompts the Court to prevent the people of this state from voting on an enormously important policy question, one might assume that these 21 characters make up some critically important provision of this measure. One would be wrong. The 21 characters are the section numbers , which aren't part of the substantive law, which won't be codified,[21] and which in no way affect the reader's ability to understand the measure.[22]
¶14 Until now, we have always reviewed referendum petitions for substantial compliance,[23] and merely omitting 21 unimportant characters of text out of 80,000 is undoubtedly the sort of "technical" or "clerical" error that does not violate the substantial compliance standard.[24] Implicitly acknowledging as much, the Court resorts to changing the standard to one that it believes the petition cannot satisfy: "strict compliance."[25] In so doing, the Court disregards both statute and its own precedents, and does so unnecessarily.[26]
¶15 First, the law requires us to evaluate the "exact copy" requirement in title 34, section 1 of the Oklahoma Statutes by the same standard we use to evaluate every other procedural requirement in title 34: substantial compliance. Both sections 1 and 24 of title 34 tell us to do so,[27] and we have accordingly previously held that "substantial compliance" is how we evaluate compliance with the "exact copy" requirement.[28]
¶16 In In re Referendum Petition No. 1968-1 of City of Norman , the proponents attached a photocopy of the text of the measure, but reduced the size to where the words appeared in 4-point font--something about like this.[29] The petition was challenged on the grounds that this shrunken copy of the measure was not an "exact copy of the title and text of the measure."[30] In rejecting that claim, this Court said the following:
*888 Certainly the reading of the ordinance as presented in the petition is tedious. Yet it is legible. We are unable to agree with the appellants' contention that a writing which is tiresome to read is ipso facto fraudulent, corruptive or deceptive. The issue is one of first impression and no standard for the size of type has heretofore been enunciated. The duty devolving upon the correlative legislative branch of government under Const. Art. 5 § 8 causes this court to feel reluctant to adjudicate invalidity of this referendum petition on technical grounds, as technical errors are to be disregarded if the intended purpose can be attained. 34 O.S.1961, § 24. Ruth v. Peshek , 153 Okl. 147, 5 P.2d 108. We must however, in conformance with the intent of the legislature, state that a 4 point type borders on the unreadable by those with some defect in eyesight and strains the visual acuity of the normal, and while not reversible error in the present case, it is discouraged.[31]
In other words, the Court (1) held that section 24's substantial compliance standard applied to section 1's new "exact copy" requirement, (2) acknowledged that Article V, Section 8 of the Oklahoma Constitution gave the Legislature only a limited role in policing referendum petitions and accordingly prevented the Court from invalidating a petition on "technical" grounds, and (3) held that a problem with the copy that made it "tedious" and "bordering on the unreadable" to some was not reason enough to invalidate the petition.
¶17 This petition should receive the same treatment, but it doesn't. The Court invalidates the petition because in its view omission of the measure's section numbers makes "internal navigation of the bill ...excessively cumbersome"[32] -precisely the reasoning that the Court expressly rejected in the 1970 case. As we said there, the fact that something is copied in such a way as to make its reading "tedious," "tiresome," or " cumbersome" does not make it invalid. But the Court abandons this precedent with nary a mention, so we are left guessing why stare decisis was ignored in a case involving stare decisis of the strongest sort.[33]
¶18 Second, the Court's justifications for its brand new interpretations of sections 1 and 24 are unpersuasive. The Court first points to the fact that the Legislature added the "exact copy" language on the heels of one of our decisions as evidence that the Legislature intended to change the standard of review.[34] As explained above, though, we had an opportunity to interpret the new "exact copy" language before today in In re Referendum Petition No. 1968-1 of City of Norman , and concluded there that the standard of review for that requirement was still substantial compliance.[35]
*889 ¶19 But even if you ignore our precedent in In re Referendum Petition No. 1968-1 of City of Norman , the issue in that earlier case, In re Referendum Petition No. 130 , was not whether the copy attached to the petition was sufficient or "exact" enough to satisfy the statutes. Rather, the question there was whether the statute required any copy at all.[36] We held in that case that no copy was required under the statute because there was no language to that effect in 1960.[37] But in 1961 the Legislature added language to require such a copy while leaving the language establishing the substantial-compliance standard in both sections 1 and 24 intact.[38] Accordingly, while I agree that, when the Legislature amended section 1 in 1961, it intended to change the state of the law with respect to what must be attached, I disagree that that amendment effected any change to the standard by which we measure compliance with that new requirement--as evidenced by the Court's decision in In re Referendum Petition No. 1968-1 of City of Norman .
¶20 The Court also invokes the "specific versus general" canon to conclude that the conflict between section 1's "exact copy" requirement and section 24's "substantial compliance" requirement should be resolved in favor of section 1, as that is the provision that specifically pertains to copies of the text of the measure.[39] There is no such conflict, however. Section 1 provides proponents with procedural requirements; it says, in relevant part, that they are to insert in the petition an exact copy of the text of the measure. Section 24, meanwhile, provides this Court with the standard by which to measure compliance with those procedural requirements; it says that we are to search for only substantial compliance and that we are to "disregard[ ]" clerical and technical errors. Only if section 1 required one standard and section 24 required another, would there be any need for us to resolve a conflict. But there is no conflict between these provisions; there is in fact harmony in that both endorse substantial compliance as the relevant standard- section 24 plainly saying so, and section 1 prefacing its procedural requirements with: "The referendum petition shall be substantially as follows ...." There is, quite simply, nothing in title 34-or our cases interpreting it-to suggest that the law requires anything more than substantial compliance.
¶21 Applying that venerable standard to this petition, the copy the proponents attached to this petition is more than sufficient. The function of inserting a copy of the text of the measure is to inform the people of the substance of the law being referred to them-to allow those most curious of signatories to know exactly what they're being asked to sign so that they may make an intelligent decision about whether to do so.[40] Here, the proponents inserted every word of the law proposed in HB 1010xx; they didn't change a single punctuation mark. Nor did they rearrange any parts of the law; they left the order of each section exactly the same. The only things missing from what they inserted, when compared to the Bill itself, are the page numbers of the bill, the signature blocks at the end, and the section numbers. Mind, however, that when we say "section numbers," what we mean is just the number itself. For example, the first section of the Bill reads:
SECTION 1. NEW LAW A new section of law not to be codified in the Oklahoma *890 Statutes reads as follows:
The provisions of this measure are enacted pursuant to the authority provided in Section 57 of Article V of the Oklahoma Constitution for a general revenue bill.[41]
The first section in the copy attached to the petition reads:
SECTION . NEW LAW A new section of law not to be codified in the Oklahoma Statutes reads as follows:
The provisions of this measure are enacted pursuant to the authority provided in Section 57 of Article V of the Oklahoma Constitution for a general revenue bill.[42]
No one would say that the difference between these two texts hampers their ability to understand the proposed law. In fact, if I hadn't told you there was a difference, would you have even noticed?
¶22 To be sure, this petition may not comport with "best practice"[43] ; but that shouldn't (and before now, wouldn't) make it insufficient. So long as a potential signatory can understand the nature and effect of the law from what he or she has been provided, then what has been provided should suffice. I have faith that the people of Oklahoma are more than capable of understanding the impact of this law after reading this petition, and thus-according to the law and our prior cases interpreting it-this petition should survive.
* * *
¶23 This referendum petition may well be imperfect-its ballot title will need correcting if it ever gets to that point, and the failure to include a copy of HB 1010xx containing section numbers was a regrettable oversight-but our Constitution doesn't require these things to be perfect.[44] It couldn't, because democracy is inherently imperfect. The cure for democracy's imperfections, however, is more democracy, not less. Accordingly, we should let the voters decide this one-it's their State, after all.[45]
¶24 I respectfully dissent.

§ 33. Revenue bills - Origination - Amendment - Limitations on passage - Effective date - Submission to voters.
A. All bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills.
B. No revenue bill shall be passed during the five last days of the session.
C. Any revenue bill originating in the House of Representatives shall not become effective until it has been referred to the people of the state at the next general election held throughout the state and shall become effective and be in force when it has been approved by a majority of the votes cast on the measure at such election and not otherwise, except as otherwise provided in subsection D of this section.
D. Any revenue bill originating in the House of Representatives may become law without being submitted to a vote of the people of the state if such bill receives the approval of three-fourths (3/4) of the membership of the House of Representatives and three-fourths (3/4) of the membership of the Senate and is submitted to the Governor for appropriate action. Any such revenue bill shall not be subject to the emergency measure provision authorized in Section 58 of this Article and shall not become effective and be in force until ninety days after it has been approved by the Legislature, and acted on by the Governor.
Amended by State Question No. 640, Initiative Petition No. 348, adopted at election held March 10, 1992.

A. Any person who is dissatisfied with the wording of a ballot title may, within ten (10) business days after the same is published by the Secretary of State as provided for in subsection I of Section 8 of this title, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to the provisions of Section 9 of this title.
B. No such appeal shall be allowed as to the ballot title of constitutional and legislative enactments proposed by the Legislature.
Amended by Laws 2015, HB 1484, c. 193, § 6, emerg. eff. April 28, 2015.

34 O.S.Supp.2017 § 8(B) ("It shall be the duty of the Secretary of State to cause to be published, in at least one newspaper of general circulation in the state, a notice of such filing and the apparent sufficiency or insufficiency of the petition . . . ."); see id. § 9(C)-(D) (charging the Attorney General with the responsibility of reviewing proposed ballot titles for "legal correctness").

Okla. Sec'y of State, Notice of the Filing of State Question 799, Referendum Petition 25, App., Doc. 9, pp.1-3 ("NOTICE is also hereby given that State Question 799, Referendum Petition 25 is SUFFICIENT for filing with the Office of the Oklahoma Secretary of State."); Br. of the State of Oklahoma 15 (urging the Court to deny the protests so as "not [to] allow citizens seeking to petition their government for redress through referendum to 'be throttled with technicalities.' " (quoting Caruth v. State ex rel. Tobin , 1923 OK 980, ¶ 13, 223 P. 186, 190 )).

See Okla. Indep. Petroleum Ass'n v. Potts , 2018 OK 24, ¶¶ 6-10, 414 P.3d 351, 362-64 (Wyrick, J., concurring specially) (arguing that nothing in our Constitution or statutes authorizes our judge-made gist jurisprudence).

See Majority Op. ¶ 40.

Okla. Const. art. V, § 33 (D) (prohibiting the Legislature from enacting revenue bills as emergency measures, and thereby excluding revenue bills from the exception to the referendum power in Article V, Section 2 for "laws necessary for the immediate preservation of the public peace, health, or safety").

Signature Sheet for State Question 799, Referendum Petition 25, App., Doc. 1, p.39.

All one need do is look at how news professionals--whose very job it is to summarize information for public consumption-describe the proposal. See, e.g. , Kimberly Querry, Oklahoma Supreme Court Decides Petition to Repeal Tax Hikes Is Invalid , KFOR (June 22, 2018), https://kfor.com/2018/06/22/oklahoma-supreme-court-decides-petition-torepeal- tax-hikes-is-invalid/ (describing the petition as a "petition to repeal tax hikes"); Petition to Repeal Tax Hikes Will Not Be on Ballot , Edmond Sun (June 22, 2018), http://www.edmondsun.com/ news/petition-to-repeal-tax-hikes-willnot- be-on-ballot/article_be604da2-7636-11e8-8c6d-ff335341 548d.html (same); Tim Talley, Oklahoma Supreme Court Voids Challenge to Teacher Pay Tax , Associated Press (June 22, 2018), https://www.apnews.com/ 465a14a23e4a496ba3f37833d931fef6 (describing the petition as "an initiative petition that would overturn a package of tax hikes"); Emily Wendler, Anxiety About Teacher Pay-Raises Grows as Tax Repeal Effort Builds and Legal Questions Mount , State Impact Oklahoma (June 14, 2018), https://stateimpact.npr.org/ oklahoma/2018/06/14/anxiety-aboutteacher- pay-raises-grows-as-tax-repeal-effort-builds-and-legal-questions-mount/ (describing the petition as a "tax repeal effort"); Chris Casteel, Court Hears Challenges to Anti-Tax Campaign , Oklahoman, June 12, 2018, at 1A (repeatedly describing the petition as a "repeal" of "recent tax hikes," of a "tax package," or of a "tax bill"); Barbara Hoberock, Supreme Court Hears Tax Repeal Arguments, Tulsa World, June 12, 2018, at A1 (explaining the petition "ask[s] voters to repeal House Bill 1010xx"); Trevor Brown & Jennifer Palmer, Q&A: What You Need to Know About Challenge to Tax Rollback Petition , Oklahoma Watch (June 11, 2018), http://oklahomawatch.org/2018/06/11/ lawsuit-against-taxrollback- petition-explained/ (describing the petition as a "tax rollback petition").

34 O.S. § 2011

See Majority Op. ¶¶ 27--34.

Even if approved, the referendum cannot "re-animate" the hotel tax, because it has already been repealed. A referendum cannot enact new law; it can merely approve or disapprove the effectiveness of already-enacted legislation. Because of the repeal, "re-animation" of the hotel tax would require the enactment of new law, which--if attempted through direct democracy--can only be done through initiative petition.

Br. of the State of Oklahoma 7--8. The majority also suggests that the proponents should have excluded the hotel/motel tax sections from their referendum. They certainly could have, but there is nothing in the law requiring them to do so. Moreover, the proponents have a good reason for including it in their referendum because, despite its repeal, disapproval of HB 1010xx through referendum makes it significantly more difficult for any initiative petition to seek reenactment of the repealed provisions. Okla. Const. art. V, § 6 ("Any measure rejected by the people, through the powers of the initiative and referendum, cannot be again proposed by the initiative within three years thereafter by less than twenty-five per centum of the legal voters."). Thus, inclusion of the hotel/motel tax provisions serves a purpose for these proponents, and we have no constitutional or statutory basis upon which to fault their decision to seek a referendum on all of HB 1010xx, rather than merely part of it.

Signature Sheet for State Question 799, Referendum Petition 25, App., Doc. 1, p.39.

See Webster's New International Dictionary 485 (2d ed. 1959) (defining "cigarette" as "[l]iterally, a little cigar").

Okla. Tax Comm'n, Fiscal Impact Statement for HB 1010xx, at 1--2 (March 27, 2018), available at http://webserver1.lsb.state.ok.us/cf_pdf/2017-18%20SUPPORT %20DOCUMENTS/impact%20statements/fiscal/senate/HB1010XX%20ENG%20FI.PDF (calculating the expected additional revenue from the "little cigar" tax to be $954,000 out of an expected $474,696,000 from HB 1010xx as a whole).

Webster's New International Dictionary, supra note 13, at 1060 (defining "gist" as "[t]he main point, or material part...; the pith of the matter").

Again, one need only look to how others have summarized the petition to understand that the hotel/motel and little cigar taxes are ancillary details that reasonable people readily omit from their descriptions of the proposal. Kimberly Querry, Leaders Release Statements About Oklahoma Supreme Court's Tax Repeal Decision , KFOR (June 22, 2018), https://kfor.com/2018/06/22/leaders-release-statements-about-oklahoma-supreme-courts-tax-repeal-decision/ (describing HB 1010xx as a bill that "raises taxes on cigarettes, motor fuels and some oil and gas production"); Wendler, supra note 7 (describing HB 1010xx as a "$430 million tax package, which includes tax increases on cigarettes, gasoline and oil and gas production"); Brown & Palmer, supra note 7 (stating the bill contained "tax increases on cigarettes, motor fuel and oil and gas production"); Oklahoma High Court Mulls Challenge to Tax for Teacher Pay, Associated Press (June 11, 2018), https://www.apnews.com/03f0755bd82e42469ba2d4ed93ac9f78 (describing the bill as "tax hikes on cigarettes, fuel and energy production"); Sean Murphy, Teachers' Group Seeks to Stop Oklahoma Anti-Tax Question , US News (May 14, 2018), https://www.usnews.com/news/beststates/ oklahoma/articles/2018-05-14/ teachers-group-seeks-to-stop-oklahoma-anti-tax-question (describing the bill as "tax hikes on cigarettes, motor fuel and energy production"); Samuel Hardiman, Anti-Tax Petitioners, Teachers Organize for Fight , Tulsa World, May 10, 2018, at A3 (explaining that HB 1010xx "imposes an additional $1-per-pack cigarette tax, raises the gross production tax on new horizontal oil and gas wells from 2 percent to 5 percent, and raises fuel taxes by 3 cents per gallon on gasoline and 6 cents per gallon on diesel."); William W. Savage III, Teacher: Veto Referendum 'Feels Like an Attack on Public Education' , NonDoc (May 1, 2018), https://nondoc.com/ 2018/05/01/vetoreferendum- being-filed-hb-1010xx/ (explaining that HB 1010xx "raised the gross production tax incentive rate on oil and gas production from 2 percent to 5 percent, implemented a new $1-per-pack tax on cigarettes and raised the tax on gasoline $0.03 and the tax on diesel fuel $0.06.").

34 O.S.Supp.2017 § 1.

State Question 799, Referendum Petition 25, App., Doc. 1, p.1.

See id. at pp.4--7.

See Majority Op. ¶ 21 (noting that the referendum petition mentions the little cigar tax but concluding that the gist is deficient because it and the petition "do not match").

For example, if you visit the Court's website and look up the codified versions of the statutes enacted by HB 1010xx, you will find that section numbers are omitted. See, e.g. , 68 O.S. 302-7 (effective July 19, 2018) (found at: http://www.oscn.net/ applications/oscn/DeliverDocument.asp?CiteID=482824) (containing the codified text of HB 1010xx's "Section 2" but omitting the non-codified portions, which include any reference to "Section 2"). I certainly don't think the Court is trying to "mislead" anyone by omitting the section numbers. Rather, they are omitted because they are not part of the substantive law.

You'd be hard-pressed to derive any substantive meaning from the bill's section numbers. All of the law's substance-- all of its impact on daily life--lies in the words that come after the section number. For example, it doesn't mean anything for the cigarette tax to be at "Section ."; "Section 2."; or Section 222 of this Bill. What matters to the signatories and to the future voters is that "there is hereby levied upon the sale, use, gift, possession or consumption of cigarettes ...a tax at the rate of fifty (50) mills per cigarette." HB 1010xx, § 2(A), 56th Leg., 2d Extra. Sess. (Okla. 2017); State Question 799, Referendum Petition 25, App., Doc. 1, p.3. It's that information that the people want and need in order to make an informed decision about whether to join in this petition, and it is that information that was provided here. Thus, again, because I think the purposes of the statute requiring the attachment of an "exact copy of the text of the measure" are satisfied by the copy of the text inserted in this petition, I see no reason to invalidate the entire referendum on a hyper-technicality.

34 O.S.Supp.2017 § 1 ("The referendum petition shall be substantially as follows:... The question we herewith submit to our fellow voters is: Shall the following bill of the legislature (or ordinance or resolution--local legislation) be approved? (Insert here an exact copy of the text of the measure.)"); 34 O.S.2011 § 24 ("The procedure herein prescribed is not mandatory, but if substantially followed will be sufficient. If the end aimed at can be attained and procedure shall be sustained, clerical and mere technical errors shall be disregarded.").

34 O.S.2011 § 24.

Majority Op. ¶ 54.

Given its invalidation of the petition on other grounds, the Court had no reason to reach the "exact copy" question.

See supra note 23.

See In re Referendum Petition No. 1968-1 of City of Norman , 1970 OK 143, ¶ 5, 475 P.2d 381, 383 (citing 34 O.S.1961 § 24 ).

Id. ¶ 4, 475 P.2d at 383.

When the exact copy requirement was first added to section 1, it required an "exact copy of the title and text of the measure." Act of May 17, 1961, tit. 34, § 1, 1961 O.S.L. 263, 264 (codified at 34 O.S.1961 § 1 ). Section 1 was amended in 2015 to read "exact copy of the text of the measure." Act of April 28, 2015, ch. 193, § 1, 2015 O.S.L. 635, 635 (codified at 34 O.S.Supp.2017 § 1 ).

In re Referendum Petition No. 1968-1 of City of Norman , 1970 OK 143, ¶ 5, 475 P.2d at 383.

Majority Op. ¶ 54. HB 1010xx contains sixteen sections. One doesn't need to know the section numbers in order to understand the bill, but in any event, I am confident that the average voter can count to sixteen. So I disagree with the premise that failure to include section numbers makes the bill "excessively cumbersome" to navigate.

See Bryan A. Garner et al., The Law of Judicial Precedents 333 (2016) (explaining that "[s]tare decisis applies with special force to questions of statutory construction. Although courts have power to overrule their decisions and change their interpretations, they do so only for the most compelling reasons-but almost never when the previous decision ... has long been acquiesced in"). This is so because unlike constitutional interpretation, if a court erroneously interprets a statute, the Legislature is free to correct the error by amending the statute. When the Legislature does not, it is said to have acquiesced in the Court's interpretation of its statute. "Hence courts generally won't depart from a settled judicial interpretation of a statute even if the earlier holding is of questionable validity." Id. at 335 (citing llinois Brick Co. v. Illinois , 431 U.S. 720, 736-37 (1977), for the proposition that "considerations of stare decisis weigh heavily in the area of statutory construction, where Congress is free to change th[e] Court's interpretation of its legislation ..., even if the Court were persuaded" that the earlier decision was wrong, and citing Hill v. Atlantic & North Carolina Railroad , 55 S.E. 854, 868 (N.C. 1906), for the proposition that "an authoritative judicial construction put upon a statute has the force of law by becoming, as it were, a part of the statute itself").

Majority Op. ¶¶ 46-47 (discussing In re Referendum Petition No. 130, State Question No. 395 , 1960 OK 185, 354 P.2d 400 ).

See supra ¶¶ 16-17 (discussing In re Referendum Petition No. 1968-1 of City of Norman , 1970 OK 143, ¶¶ 4-5, 475 P.2d at 383 ).

In re Referendum Petition No. 130 , 1960 OK 185, ¶¶ 7, 10-11, 354 P.2d at 403-04.

Id. ¶ 8, 354 P.2d at 403.

Act of May 17, 1961, tit. 34, § 1, 1961 O.S.L. 263, 263--64.

Majority Op. ¶ 49.

See Townsend v. McDonald , 42 S.W.2d 410, 412 (Ark. 1931) (explaining the purpose of Arkansas's precursor statute as follows:
The purpose of the section with regard to petitions for initiative measures is clear. The people could not intelligently act on an initiative measure, unless a copy of the measure itself was before them. The same reasoning would obtain in cases of a measure referred to the people. A full and correct copy of the measure attached to the petition would enable the signer thereto to act intelligently in the premises. Of course, he would not be required to read the measure, but it would be his duty to inform himself of its contents, and this would be a certain way for the signer to know that a different petition would not be presented from that signed by him. The signer would know that he was signing the measure passed by the Legislature, and was not taking the opinion of any one else as to the meaning of it.

Act of March 29, 2018, ch. 8XX, § 1, 2017 O.S.L. 1643, 1643.

State Question 799, Referendum Petition 25, App., Doc. 1, p.3.

Majority Op. ¶ 52 n.12.

Remember, the Legislature's only power with regard to referendum and initiative petitions is the power to make laws to "prevent corruption in making, procuring, and submitting initiative and referendum petitions." Okla. Const. art. V, § 8. All other powers relating to referendum and initiative petitions are reserved to the People. Okla. Const. art. V, § 1 ("The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature.").

"The ultimate rulers of our democracy are not a President and Senators and Congressmen and Government officials, but the voters of this country." Franklin D. Roosevelt, Address at Marietta, Ohio (July 8, 1938) (transcript available at http://www.presidency.ucsb.edu/ws/?pid=15672).